# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | |
|---|---|
| JOHANN MOONESINGHE, as Personal Representative on behalf of the Estate of RAJAN MOONESINGHE; RUTH MOONESINGHE, individually as the surviving mother of RAJAN MOONESINGHE; and KAVAN MOONESINGHE, individually as the surviving father of RAJAN MOONESINGHE | ) ) ) ) ) ) ) ) ) |
| | ) |
| **Plaintiffs,** | ) |
| v. | ) |

**CIVIL ACTION NO. 1:24-cv-1375**

**JURY TRIAL DEMANDED**

CITY OF AUSTIN, DANIEL SANCHEZ, STEPHEN MARKERT, and LUIS BRITO

**Defendants.**

## ORIGINAL COMPLAINT

Plaintiffs JOHANN MOONESINGHE, on behalf of the estate of his deceased brother, RAJAN MOONESINGHE, RUTH MOONESINGHE, on behalf of herself as the surviving mother of RAJAN MOONESINGHE, and KAVAN MOONESINGHE, on behalf of himself as the surviving father of RAJAN MOONESINGHE (collectively "Plaintiffs"), by and through their attorneys, bring this action for damages and other legal and equitable relief from Defendants CITY OF AUSTIN, DANIEL SANCHEZ, STEPHEN MARKERT, and LUIS BRITO (collectively "Defendants"), for violations of rights under the United States Constitution actionable under 42 U.S.C.A. § 1983, and any other cause(s) of action that can be inferred from the facts set forth herein.

ORIGINAL COMPLAINT

## INTRODUCTION

1.      This is an action brought by Plaintiffs individually and on behalf of their deceased relative, Rajan Moonesinghe, against Defendants for the use of deadly excessive force that unlawfully killed Mr. Moonesinghe under the color of law and in violation of his rights under the Fourth and Fourteenth Amendments of the United States Constitution.

2.      In the early morning of November 15, 2022, Defendant Daniel Sanchez, a law enforcement officer of the City of Austin ("City Defendant"), arrived at Rajan Moonesinghe's home in response to a 911 dispatch. Within nine seconds of his arrival at the house, Defendant Sanchez fired his rifle five times at Mr. Moonesinghe despite the absence of any objective immediate threat to Defendant Sanchez or any other person. Shortly thereafter, Mr. Moonesinghe died due to Defendant Sanchez's deadly excessive force and Defendant Sanchez, Defendant Markert, and Defendant Brito's (collectively, "the Officer Defendants") failure to provide immediate medical attention.

3.      The City Defendant's unconstitutional unlawful customs and unlawful official policies regarding the use of deadly force were the moving force behind Mr. Moonesinghe's injuries and his wrongful death at the hands of Defendant Sanchez.

4.      As a result of Defendants' unlawful actions, Plaintiff Ruth Moonesinghe, individually as the mother of Rajan Moonesinghe, Plaintiff Kavan Moonesinghe, individually as the father of Rajan Moonesinghe, and Plaintiff Johann Moonesinghe as the personal representative of Mr. Moonesinghe's estate, are entitled to recover damages pursuant to violations of rights under the United States Constitution, including protections against deadly excessive force under the Fourth Amendment actionable under 42 U.S.C.A. § 1983, protections against the deliberate indifference to serious medical needs under the Fourteenth Amendment actionable under 42

**ORIGINAL COMPLAINT**

U.S.C.A. § 1983, municipal liability for unlawful customs or practices that authorized the Defendant Sanchez's use of deadly excessive force against Mr. Moonesinghe actionable under 42 U.S.C.A. § 1983, municipal liability for facially unconstitutional policies that authorized Defendant Sanchez's use of deadly excessive force against Mr. Moonesinghe actionable under 42 U.S.C.A. § 1983, and for wrongful death actionable under 42 U.S.C.A. § 1983.

5.       Preliminary expert analysis indicates that the economic damage caused to Rajan Moonesinghe's estate by the Defendants' actions currently totals $19,203,385.37, and will increase to a minimum of $129,935,250.00 by 2034.  These amounts do not include the pain and suffering caused to Rajan Moonesinghe by the Defendants' actions, for which additional damages are sought.

## JURISDICTION AND VENUE

6.       This Court has jurisdiction over this action pursuant to (i) 28 U.S.C.A. § 1331, which confers original jurisdiction upon this Court for actions arising under the laws of the United States; (ii) 28 U.S.C.A. § 1343(a)(3) which confers original jurisdiction upon this Court in any civil action to redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; (iii) 28 U.S.C.A § 1343(a)(4), which confers original jurisdiction upon this Court in any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of civil rights a civil action to recover damages or to secure equitable; and (iv) under the Declaratory Judgment Statute, 28 U.S.C. § 2201; 42 U.S.C. §§ 2000e *et seq.*, as amended.

**ORIGINAL COMPLAINT**

7.     Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## PARTIES

8.     Ruth Moonesinghe is and has been, at all relevant times, a citizen of the United States of America. Ms. Moonesinghe sues on behalf of herself as the wrongful death beneficiary of her son, Rajan Moonesinghe.

9.     Kavan Moonesinghe is and has been, at all relevant times, a citizen of the United States of America. Kavan Moonesinghe sues on behalf of himself as the wrongful death beneficiary of his son, Rajan Moonesinghe.

10.     Johann Moonesinghe is and has been, at all relevant times, a citizen of the United States of America. Johann Moonesinghe sues on behalf of Rajan Moonesinghe as the personal representative and administrator of the Estate of Rajan Moonesinghe.

11.     The City of Austin is a local governing municipality located in Travis County, Texas. The City of Austin funds and operates the Austin Police Department. Under the Austin City Charter and Austin Code of Ordinances, the Austin Police Department's Chief of Police is delegated with official policymaking authority to establish, operate, and supervise all policies regarding law enforcement operations, the suppression of crime, and the arrest of individuals within the City of Austin. In addition, the Austin Police Department, under the Austin Police Chief, is responsible for the implementation of the law enforcement budget, policies, procedures, practices, and customs, and the acts and omissions of its law enforcement officers based on these policies and the training of each officer within law enforcement operations. The City of Austin is within the Western District of Texas.

**ORIGINAL COMPLAINT**

12.     Officer Daniel Sanchez is a law enforcement officer with the Austin Police Department and is an employee of the City of Austin. At all relevant times, Officer Sanchez acted under the color of law as a law enforcement officer on behalf of the City of Austin. Officer Sanchez is sued in his individual capacity.

13.     Officer Stephen Markert is a law enforcement officer with the Austin Police Department and is an employee of the City of Austin. At all relevant times, Officer Markert acted under the color of law as a law enforcement officer on behalf of the City of Austin. Officer Markert is sued in his individual capacity.

14.     Officer Luis Brito is a law enforcement officer with the Austin Police Department and is an employee of the City of Austin. At all relevant times, Officer Brito acted under the color of law as a law enforcement officer on behalf of the City of Austin. Officer Brito is sued in his individual capacity.

### STATEMENT OF FACTS

#### A.  *The Killing of Rajan Moonesinghe*

15.     On or around the early morning of November 15, 2022, the Austin Police Department (APD) received a call about an apparent robbery at the home of Rajan Moonesinghe, a Sri Lankan-American man.

16.     The call was made by a security guard employed by Mr. Moonesinghe's neighbor. The call noted that Mr. Moonesinghe was armed with a firearm and yelling at an apparent intruder in his home.

17.     Mr. Moonesinghe was outside his home issuing orders to the apparent intruder to leave his property and aiming his firearm into his house.

**ORIGINAL COMPLAINT**

18.    Defendants Sanchez and Markert responded to the call and arrived at Mr. Moonesinghe's home three minutes later.

19.    As Defendant Sanchez exited his vehicle, he overheard Mr. Moonesinghe fire his weapon into his home. Defendant Sanchez then approached Mr. Moonesinghe's home with his assault rifle armed and ready.

20.    At this time, Mr. Moonesinghe was standing on the front of his porch and was unaware of the approaching law enforcement officers. Approximately five seconds later, Defendant Sanchez approached Mr. Moonesinghe and observed him standing on his porch with his firearm clearly aimed at the ground.

21.    Defendant Sanchez ordered Mr. Moonesinghe to "drop the gun." Mr. Moonesinghe's firearm was pointed only towards the ground, as pictured below:



**ORIGINAL COMPLAINT**

22.     At that exact moment in time, Mr. Moonesinghe presented no objective immediate threat of serious or significant harm to any person or Defendant Sanchez.

23.     Despite the absence of any threat, Defendant Sanchez fired his assault rifle at Mr. Moonesinghe three times. Defendant Sanchez denied Mr. Moonesinghe any opportunity to comply with his order because he ordered Mr. Moonesinghe to drop his gun and began shooting simultaneously.

24.     As the three bullets struck Mr. Moonesinghe, he stumbled forward and dropped his firearm on the ground. Mr. Moonesinghe then stumbled backward away from the firearm. Again, it was objectively clear that Mr. Moonesinghe presented no immediate threat to any person or Defendant Sanchez.

25.     Despite the absence of any immediate threat of serious or significant harm, Defendant Sanchez fired his assault rifle at Mr. Moonesinghe once again as Mr. Moonesinghe was already falling to the ground.

**ORIGINAL COMPLAINT**

26.    Immediately after the fourth bullet struck Mr. Moonesinghe's body, he raised his arms by his head, as pictured below:



27.    Despite Mr. Moonesinghe raising his arms by his head and objectively posing no immediate threat of serious or significant harm, Defendant Sanchez continued shooting him.

28.    As the fifth bullet struck Mr. Moonesinghe's body, he collapsed in a fetal position on the front porch of his house.

29.    In total, Defendant Sanchez fired five bullets at Mr. Moonesinghe from his assault rifle over approximately five seconds. At no time in those five seconds did Mr. Moonesinghe present an immediate threat to any officers or other persons.

30.    Following Defendant Sanchez's unlawful use of deadly force, Mr. Moonesinghe cried out in pain that "it wasn't me" in reference to the apparent intruder within his home. Defendant Sanchez reported over his police radio that the "suspect's down, **hands were up**."

ORIGINAL COMPLAINT

Defendant Sanchez thus acknowledged that he used deadly force against Mr. Moonesinghe as his hands were up in the air and while he presented no immediate threat of serious or significant harm to any person.

31.    Defendant Markert, Defendant Brito, and Defendant Sanchez then approached Mr. Moonesinghe.

32.    Although Mr. Moonesinghe was still alive, he was bleeding profusely and unable to move due to multiple gunshot wounds in his chest, back, abdomen, and thighs.

33.    It was objectively clear that Mr. Moonesinghe posed no threat to the officers and desperately needed medical attention because Mr. Moonesinghe was curled up in a fetal position, motionless, and unresponsive. In addition, Mr. Moonesinghe's firearm was several feet away from his body.

34.    As Defendant Sanchez approached Mr. Moonesinghe, he told him to "roll over on your stomach, buddy, so we can help you." Defendant Market noted that Mr. Moonesinghe was "having trouble" as he remained motionless and struggled to maintain consciousness.

35.    Defendant Sanchez then forced Mr. Moonesinghe onto his stomach. The Officer Defendants then failed to provide aid to Mr. Moonesinghe through immediate life-saving cardiopulmonary resuscitation (CPR) or the application of any tourniquet to stem blood flow. Instead, Defendant Markert told Defendant Sanchez to "book" Mr. Moonesinghe through an arrest.

36.    Defendant Sanchez then handcuffed Mr. Moonesinghe's arms behind his back. Defendant Brito failed to intervene to ensure Mr. Moonesinghe received emergency medical attention. The Officer Defendants then searched Mr. Moonesinghe's house while he lay dying on his porch.

**ORIGINAL COMPLAINT**

37.    Other APD officers arrived on the scene several minutes later. One of the APD officers attempted to perform CPR on Mr. Moonesinghe but was unable to do so because of the handcuffs. The APD officer explicitly told the Officer Defendants that they "have to uncuff [Mr. Moonesinghe]. You can't do CPR with him in cuffs."

38.    Despite the APD officer's attempts, Mr. Moonesinghe remained handcuffed until emergency medical technicians (EMT) arrived. It was only then that a senior APD officer ordered Mr. Moonesinghe to be taken out of the handcuffs so that he could finally receive emergency medical attention.

39.    In total, after Defendant Sanchez shot Mr. Moonesinghe five times, he remained handcuffed and did not receive any medical attention for six minutes. During this time, Mr. Moonesinghe was bleeding profusely because one of Defendant Sanchez's bullets pierced the femoral artery in his leg. However, none of the Officer Defendants applied a tourniquet or attempted to stop the bleeding. Tragically, but not surprisingly, Mr. Moonesinghe died from his injuries shortly afterward.

40.    On December 20, 2023, a Travis County special grand jury indicted Defendant Sanchez with the charge of deadly conduct, a third degree felony.

**B.  *The City Defendant's Pattern of Excessive Force Against Persons of Color Displaying No Immediate Threat of Serious or Significant Harm***

41.    Mr. Moonesinghe's death from Defendant Sanchez's unlawful use of deadly force arose from a long history of APD officers using excessive force against persons of color who pose no immediate threat of serious or significant harm.

42.    On June 9, 2005, then-Officer Julie Schroeder engaged in a struggle with Daniel Rocha, a Hispanic man who was trying to flee an arrest. The APD officer claimed she could not locate her Taser and assumed Mr. Rocha had taken it. Shortly afterward, when Mr. Rocha turned

**ORIGINAL COMPLAINT**

away from her and no longer posed an immediate threat of serious or significant harm, the APD

officer shot Mr. Rocha in the back, killing him.

43.    The APD officer also claimed Mr. Rocha was reaching for her gun, but the Western

District of Texas determined that the APD officer's statements were so unbelievable that a

reasonable jury could find she used excessive force.[1] The City Defendant subsequently settled the

lawsuit for $1,000,000. The APD admitted that the APD officer used unreasonable force.

44.    On June 3, 2007, APD Sgt. Michael Olsen fatally shot Kevin Brown, a Black man,

after Olsen chased Mr. Brown alone into a field. The APD Sgt. shot Mr. Brown multiple times,

including while Mr. Brown lay on the ground and could not present an immediate threat of serious

or significant harm.

45.    Like Mr. Moonesinghe, Mr. Brown dropped his weapon moments before he was

shot by the APD Sgt. and presented no immediate threat of serious or significant harm.

46.    The APD later admitted that the APD Sgt.'s use of force was unreasonable, and the

City Defendant paid Mr. Brown's family a settlement of $1,000,000.

47.    On May 11, 2009, then-Officer Leonardo Quintana shot both Nathaniel Sanders

and Sir Smith, two Black men, after approaching their car while they were asleep. Mr. Sanders

died, while Mr. Smith survived.

48.    The APD officer and another officer approached the car from behind and could tell

through the car windows that both occupants were asleep. Instead of planning and communicating

with his partner, the APD officer woke Mr. Sanders and then saw that he had a pistol in his

waistband.

---

[1] *Rocha v. City of Austin*, No. A-06-CA-067-LY, 2007 WL 9701630 (W.D. Tex. July 6, 2007).

ORIGINAL COMPLAINT

49.    Like Mr. Moonesinghe, the APD Officer immediately opened fire before identifying himself or allowing Mr. Sanders to comply with instructions. The APD officer shot through the vehicle's rear windows and immediately killed Mr. Sanders.

50.    Mr. Smith, unarmed and suddenly under fire, awoke from sleeping and tried to escape the gunfire. Despite posing no immediate threat of serious and significant harm, the APD officer shot Mr. Smith as he exited the car. Throughout the APD officer's use of deadly force, Mr. Sanders' pistol still had the safety on. The City Defendant ultimately paid Mr. Sanders' family $750,000 and Mr. Smith $175,000.

51.    On May 30, 2011, Officer Nathan Wagner fatally shot Byron Carter, Jr., a 20-year-old Black man. Mr. Carter was in a vehicle driven by a 16-year-old Black child, L.W., while exiting a tight parallel parking space after 11:00 pm. Unbeknownst to Mr. Carter and L.W., the APD officer and his partner were nearby on foot, following Mr. Carter and L.W. surreptitiously without suspicion of any crime.

52.    Shortly afterward, L.W. heard Mr. Carter say, "Go," in a fearful tone, so he exited the parking space. The APD officer claimed the vehicle sped towards him and his fellow officer. After the car drove away and could not objectively pose an immediate threat of serious or significant harm to either officer, the APD Officer fired his weapon five times into the driver's side area of the vehicle.

53.    Ultimately,  the APD officer's use of deadly force wounded L.W. and killed Mr. Carter. L.W. and Mr. Carter's family sued in the Western District of Texas. On May 20, 2013, the Western District of Texas denied summary judgment for the APD officer.[2]

---

[2] *Carter v. Wagner*, No. 1:11-cv-887-LY, 2013 WL 12121445, at *1 (W.D. Tex. May 20, 2013).

**ORIGINAL COMPLAINT**

54.    On April 29, 2011, APD officers Eric Copeland and Russell Rose used excessive force against Carlos Chacon, a Hispanic man. Like Mr. Moonesinghe, the APD officers were responding to a 911 call about a robbery against Mr. Chacon.

55.    When the APD officers arrived and saw Mr. Chacon, they quickly drew their firearms on Mr. Chacon before even speaking with him and became angry when Mr. Chacon did not immediately comply with several unreasonable, contradictory, and profanity-laced commands.

56.    The APD officers eventually forced Mr. Chacon to the ground, despite his testimony that he tried to lower himself to the ground slowly and video showing he never threatened or moved away from the officers. The Officers then escalated to punching and tasing Chacon despite him presenting no immediate threat or acts of resistance.

57.    Mr. Chacon subsequently sued the City Defendant. During summary judgment, Judge Sam Sparks noted that the APD officers behaved unreasonably, and it was "the officers who escalated the situation by drawing their weapons and shouting profanity."[3] On May 13, 2015, a jury awarded Mr. Chacon $1,000,000.[4]

58.    On April 5, 2012, Officer Copeland (the same officer who abused Mr. Chacon) shot and killed Ahmede Bradley, a Black man, during a traffic stop.

59.    Mr. Bradley initially fled the stop, then pulled over, exited his vehicle, and ran away on foot. The APD Officer angrily gave chase on foot and shouted that he would kill Mr. Bradley. The APD officer proceeded to tase Mr. Bradley and beat him severely before he fatally shot him three times.

60.    Throughout this time, Mr. Bradley presented no immediate threat of serious or significant harm as he simply escaped arrest on foot following a traffic stop. Indeed, then-Police

---

[3] *Chacon v. City of Austin*, No. 1:12-cv-00226-SS, 2013 WL 2245139, at *14 (W.D. Tex. May 21, 2013).
[4] *Id.* at *2-3.

**ORIGINAL COMPLAINT**

Monitor Fraiser, the former Sheriff of Travis County, noted that the shooting was unjustified because Mr. Bradley was trying to escape, so he was not an immediate threat requiring deadly force.

61.    Mr. Bradley's family subsequently sued the APD officer and the City Defendant in the Western District of Texas. The APD officer was denied summary judgment for his killing of Mr. Bradley.[5]

62.    On June 7, 2012, Officer Jesus Sanchez used excessive force to tackle Pete Hernandez, a Hispanic man whose only "crime" was exiting a Wal-Mart store. As Mr. Hernandez walked through the parking lot, a police officer suddenly yelled behind him to "stay" and "get on the ground." Mr. Hernandez stopped walking.

63.    Like Mr. Moonesinghe, Mr. Hernandez was not given the opportunity to comply further with the APD officer's orders because, seconds later, the APD officer executed a flying tackle, slamming him into the ground. Mr. Hernandez subsequently sued the City Defendant and the APD officer. A jury later found that the APD officer used excessive force and awarded Mr. Hernandez $877,000.[6]

64.    On July 29, 2013, APD Det. Charles Kleinert fatally shot Larry Jackson, Jr., a Black man. The APD officer chased Mr. Jackson on foot from a bank fraud call and even requisitioned a civilian vehicle to continue the chase before cornering Mr. Jackson alone under a bridge.

65.    The APD Officer proceeded to beat and then shoot Mr. Jackson at point-blank range. Mr. Jackson was unarmed throughout this encounter and never posed an immediate threat

---

[5] *Orr v. Copeland*, No. 1:14-cv-212-LY, 2016 WL 8678854, *1 (W.D. Tex. Jan. 6, 2016).
[6] *Hernandez v. the City of Austin*, No. A-14-CV-492-LY, Dkt. 112 (W.D. Tex. Feb. 8, 2016).

**ORIGINAL COMPLAINT**

of serious or significant harm. The City Defendant settled with Mr. Jackson's family for $1,850,000.

66.    In March 2014, APD Sgt. Greg White shot Jawhari Smith, a young twenty-two-year-old Black man, after confronting Mr. Smith when he was holding a small BB gun. Mr. Smith notified the APD officer that the "pistol" was a harmless BB gun and then aimed the BB gun away from the APD officer. Mr. Smith thus presented no immediate threat of serious or significant harm.

67.    The APD officer ordered Mr. Smith to drop the BB gun. Like Mr. Moonesinghe, the officer fired his weapon at Mr. White immediately after the order, denying Mr. Smith the ability to comply with the order. The City Defendant later settled with Mr. Smith for the APD officer's use of excessive force.

68.    On June 15, 2015, Officer Bryan Richter used excessive force against Breaion King, a 120-pound Black woman whom he had stopped for speeding. The APD officer hauled Ms. King from her seat, slammed her into a nearby vehicle, and then knocked her onto the ground multiple times despite King's minimal resistance and tiny stature.

69.    The APD officer later falsely told fellow officers that Ms. King tried to punch him. A second officer, Officer Patrick Spradlin, drove Ms. King to jail and remarked to her that Black people had "violent tendencies," so "it's probably going to go ugly" when officers deal with "African Americans."

70.    Ms. King filed suit against the City Defendant and the APD officer for this incident. During the lawsuit, then-APD police chief Art Acevedo noted that Ms. King's case reflected pervasive racial bias in the APD and specifically stated that "Had that been a pretty white girl in her Sunday best dress, I don't think [the APD officer] would have responded … that way." Judge Sparks ultimately denied the City Defendant's motion for summary judgment because a reasonable

**ORIGINAL COMPLAINT**

jury could find that the City Defendant had a custom of racially discriminatory uses of excessive force.[7]

71.     On February 8, 2016, then-Officer Geoffrey Freeman fatally shot David Joseph, a seventeen-year-old Black child, while Mr. Joseph (suffering a mental health crisis) was running naked in a suburban area.

72.     The APD officer found Mr. Joseph, naked and thus obviously unarmed, standing in the middle of a residential street. Like Mr. Moonesinghe, the APD officer exited his vehicle with his sidearm drawn and ordered Mr. Joseph not to move. Confused, Mr. Joseph instead ran towards the APD officer, who opened fire despite Mr. Joseph possessing no weapon or immediate threat of serious or significant harm. The City Defendant ultimately settled with Mr. Joseph's mother for $3,250,000.

73.     On May 2, 2017, Jason Roque, a Hispanic twenty-year-old man, was shot and killed by APD officer James Harvel. The APD officer was responding to a 911 call regarding Mr. Roque's mental health and observed Mr. Roque standing in the street with a BB gun.

74.     Like Mr. Moonesinghe, the APD officer opened fire against Mr. Roque less than a second after he ordered Mr. Roque to "put the gun down," and while Mr. Roque had not aimed the BB gun at any other person. Again, like Mr. Moonesinghe, Mr. Roque dropped the BB gun, complying with the police command, but was shot by the APD officer an additional two times. Mr. Roque subsequently died from the APD officer's gunshots in front of his mother.

75.     Mr. Roque's family subsequently sued the City Defendant and the APD officer who fatally shot Mr. Roque.  The City Defendant settled the lawsuit with Mr. Roque's family for $2.25 million.

---

[7] *King v. City of Austin, Texas*, No. A-16-CA-1020-SS, 2018 WL 2027748, at *11 (W.D. Tex. May 1, 2018)

76.     On May 7, 2017, Landon Nobles, a twenty-four-year-old Black man, was shot in the back and killed by APD officers Richard Egal and Maxwell Johnson outside a bar on East Sixth Street. Like Mr. Moonesinghe, the APD officers approached Mr. Nobles after a gunshot was fired. However, Mr. Nobles was unarmed.

77.     Mr. Nobles then ran down the street before another APD officer tripped him with a bicycle.  Mr. Nobles fell to the ground on his stomach. The APD officers proceeded to open fire against Mr. Nobles as he was on the ground and posed no immediate threat of serious or significant harm. The City Defendant ultimately settled a lawsuit with Mr. Noble's family for $3.3 million.

78.     On July 26, 2019, APD officers Karl Krycia and Christopher Taylor shot and killed Mauris Nishanga DeSilva, a forty-six-year-old Sri Lankan neuroscientist, as he was experiencing a mental health crisis. The APD officers were called to respond to the mental health crisis and approached Dr. DeSilva as he stood over ten feet away from them in a hallway. At that time, Dr. DeSilva turned towards the officers, holding a knife to his own throat.

79.     The APD officers then ordered Dr. DeSilva to drop the knife. Dr. DeSilva proceeded to bring the knife down to his side. Like Mr. Moonesinghe, Dr. DeSilva was not given an opportunity to drop the knife as the APD officers immediately opened fire despite Dr. DeSilva posing no immediate threat of serious and significant harm to the officers who stood ten feet away. The APD officers involved were later indicted for first-degree murder. Krycia is awaiting trial. Taylor was convicted for deadly conduct on October 5, 2024.

80.     On April 24, 2020, Michael Ramos, a forty-two-year-old Black man, was fatally shot by APD Officer Christopher Taylor[8] in the parking lot of an apartment building. Before the fatal shooting, Mr. Ramos exited his vehicle with his hands up in the air and was visibly unarmed.

---

[8] Officer Taylor is the same APD officer who killed Dr. DeSilva.

**ORIGINAL COMPLAINT**

Despite the absence of any immediate threat of serious or significant harm, APD officers aimed their firearms at Mr. Ramos.

81.     Shortly afterward, another APD officer fired a less-than-lethal round at Mr. Ramos' waist, prompting Mr. Ramos to fall back into his vehicle. Eleven seconds later, Mr. Ramos attempted to flee in his vehicle. Two seconds later, the APD officer fired three consecutive shots at Mr. Ramos, killing him, despite Mr. Ramos presenting no immediate threat of serious or significant harm through evading arrest. The APD officer was later indicted for the murder of Mr. Ramos.

82.     On May 31, 2020, Justin Howell, a twenty-year-old Black college student, was shot in the head by APD Officer Kyle Felton with a lead-pellet round while Mr. Howell was peacefully protesting about police brutality against persons of color. Mr. Howell immediately lost consciousness and collapsed to the ground. Like Mr. Moonesinghe, the APD officer deliberately denied Mr. Howell necessary medical treatment as the APD officer fired less-than-lethal rounds at any street medic attempting to render aid.

83.     The APD officer's use of force against Mr. Howell, while he presented no immediate threat, left Mr. Howell in a coma due to a fractured skull and severe brain damage. Mr. Howell needed to undergo emergency brain surgery and spent three weeks in the ICU on a respirator to survive the near-fatal shooting. The City Defendant ultimately settled a lawsuit with Mr. Howell for $8 million.

84.     Beyond these specific descriptions of fifteen incidents involving the use of excessive force against persons of color, there were twenty-three lawsuits brought against the City Defendant from 2013-2022 involving the use of deadly force by APD officers. Eighty-seven percent (87%) of the twenty-three lawsuits involved APD using deadly force against people of

**ORIGINAL COMPLAINT**

color; only three cases involved police using deadly force against white citizens, though approximately 50% of the City Defendant's population is white (non-Hispanic).

85.    In addition, from 2005 to 2017, APD officers used deadly force against twelve unarmed persons who were not operating a motor vehicle. Among these twelve unarmed persons, 83.3% were people of color.

86.    These uses of unlawful deadly force represent a historic pattern of disproportionate police violence against persons of color in the city of Austin. For example, the APD's records reflect that from 2006 to 2016, APD officers were more likely to use force during arrests if the subject of the arrest was a person of color than if the subject was white. When arresting Hispanic people, APD officers were, on average, 26% more likely to use force compared to when arresting white people. When arresting Black people, APD officers were, on average, 37% more likely to use force as compared to when arresting white people.

87.    Furthermore, in June 2004, the NAACP and Texas Civil Rights Project asked the U.S. Department of Justice (DOJ) to "withhold[] federal monies to the City of Austin and its police department" due to "systematic police misconduct" against people of color.

88.    The DOJ initiated an investigation and reported incidents of excessive force involving people of color declined. However, when in 2008 the DOJ's inquiry into APD ended, complaints made by members of minority communities rose again.

89.    The civil rights groups again complained in 2012 to the DOJ that APD had "a continuing pattern and practice of excessive force that disproportionately affects members of racial minority groups, particularly African American and Hispanic persons."

90.    In addition, in March 2017, the City Defendant's Mayor's Task Force on Institutional Racism and Systemic Inequities released a report that admitted that institutional

**ORIGINAL COMPLAINT**

racism exists in the APD and that, as a result, "inequities are deeply ingrained in the structures and the culture of Austin." The Task Force further found that "there are systemic inequities in law enforcement that result in racial disparities in law enforcement tactics and consequences for people of color." Despite the report, the APD failed to make any changes to address this issue.

91.    An independent study by the Science of Policing Equity, Center for Policing Equity also found that such "racial disparities in both use and severity of force" by APD officers against persons of color could not be explained by crime, poverty, education, age, or unemployment.

92.    The City Defendant's policymakers had actual knowledge of the significance of these conclusions by the Science of Policing Equity, Center for Policing Equity because the findings were widely reported, republished on the City Defendant's government website, and discussed in the City Defendant's Office of Police Monitor (OPM)'s annual report.

93.    Then-Police Monitor Frasier explained to the City Defendant's leadership, including the mayor and police chief, that "the numbers themselves showed that the use of force against brown and black persons was disproportionate to those of whites."

94.    The common thread tying together Mr. Moonesinghe's killing, the specific descriptions of fifteen incidents involving the use of excessive force against persons of color, the extensive evidence detailing a disproportionate use of force against persons of color, and the reports detailing the City Defendant's racialized policing, is that the APD's victims were people of color that presented no immediate threat of serious or significant harm.

95.    Ultimately, this widespread practice culminated in the actions of the Officer Defendants against Mr. Moonesinghe and was the moving force behind Mr. Moonesinghe's wrongful death.

### C.  The City Defendant's Unconstitutional Deadly Force Applications Policy

**ORIGINAL COMPLAINT**

96.    The City Defendant's official deadly force applications policy is contained within Section 200.5 of the APD General Orders. Section 200.5 was created, written, and promulgated by the City Defendant's official policymaker in the area of law enforcement. The City Defendant's officers, including the Officer Defendants, are required to follow the restrictions on using force within Section 200.5 in their law enforcement operations.

97.    The City Defendant's written deadly force applications policy directs APD officers to use deadly force in ways that directly contradict and fail to follow the well-established laws governing the use of deadly force by law enforcement officers.

98.    Specifically, the APD's deadly force application policy authorizes APD officers to use deadly force to "make an arrest or prevent escape after arrest when the officer has probable cause to believe that the subject has committed or intends to commit an offense involving the infliction or threatened infliction of serious bodily injury or death[.]"

99.    In application, Section 200.5 directs APD officers to be the judge, jury, and executioner of any person that the officer believes may intend to cause harm, regardless of whether that person poses an immediate threat of serious or significant harm to an officer or any other person at the moment deadly force is used.

100.    However, the "cases on deadly force are clear: an officer cannot use deadly force without an immediate serious threat to himself or others." *Reyes v. Bridgewater*, 362 Fed. Appx. 403, 409 (5th Cir. 2009).

101.    As a result, the City Defendant authorized, enabled, and trained its law enforcement officers to act on a facially unconstitutional policy in situations involving the use of deadly force.

102.    Upon information and belief, Defendant Sanchez relied on this unconstitutional policy and instruction when he fired five bullets at Mr. Moonesinghe. Defendant Sanchez acted

**ORIGINAL COMPLAINT**

intending to make an arrest or prevent escape after Defendant Sanchez heard Mr. Moonesinghe fire his weapon into his own home and executed Mr. Moonesinghe in accordance with the City Defendant's written deadly force applications policy.

### D. Mr. Moonesinghe's Death and the Impact on his Family

103.    Mr. Moonesinghe was thirty-three years old when the Officer Defendants killed him on November 15, 2022. He was a valuable member of his family and deeply loved by his mother, Ruth Moonesinghe, his father, Kavan Moonesinghe, his brother, Johann Moonesinghe, and all of his other family members.  He was a beloved member of the Austin community, and was the co-founder of InKind, a successful and growing technology company focused on the hospitality industry.  Mr. Moonesinghe was known as being kind, selfless, and a devoted friend to countless citizens of Central Texas.

104.    Mr. Moonesinghe's parents suffered substantially from the death of their son by virtue of the destruction of the parental relationship, including the right to love, affection, solace, comfort, companionship, society, emotional support, and happiness. Mr. Moonesinghe's family has continued to suffer anguish, grief, and sorrow because of Mr. Moonesinghe's death and is likely to continue to suffer for a significant period of time.

### AS AND FOR A FIRST CAUSE OF ACTION FOR A VIOLATION OF
**42 U.S.C.A. § 1983, Civil Action For Deprivation of Rights**
**(Deadly Excessive Force)**
**(As to Defendant Sanchez)**

105.    Plaintiffs repeat and re-allege the allegations contained in the paragraphs above as if fully set forth herein.

106.    The conduct alleged herein deprived Plaintiffs, on behalf of Mr. Moonesinghe, of rights and privileges secured and protected by the United States Constitution and the laws of the United States, namely the Fourth Amendment right to be free from excessive use of force. The

**ORIGINAL COMPLAINT**

conduct violated Mr. Mooninghe's clearly established constitutional rights and was not objectively reasonable under the circumstances.

107.    It is well established that the reasonableness of a deadly excessive force inquiry is confined to whether an officer was in immediate danger at the exact moment that resulted in the officer's use of deadly force. Analysis of a deadly excessive force claim does not look at any other moment in time besides the exact moment that officers used deadly force. Any events or actions leading up to the shooting are not relevant for the purposes of a deadly excessive force inquiry.

108.    Further, deadly force always violates the Fourth Amendment unless an officer had probable cause to believe that the suspect posed a threat of <u>immediate serious or significant harm</u> to the officers or others at the exact moment deadly force is used.

109.    Mr. Mooninghe was killed as a direct result of Defendant Sanchez's use of force that was objectively unreasonable at each moment deadly force was used. The facts indicate that Mr. Mooninghe presented no immediate threat of serious or significant harm to any person or any of the officers at each moment deadly force was used.

110.    When Defendant Sanchez fired the first three shots, Mr. Mooninghe was aiming his weapon at the ground, did not make any sudden movements, and had not aimed the weapon at any person or officer. Furthermore, Mr. Mooninghe was shot before he could comply with Defendant Sanchez's order to drop the weapon.

111.    When Defendant Sanchez fired the fourth shot, Mr. Mooninghe had dropped the weapon, was visibly unarmed, and clearly incapacitated after being struck by three earlier rounds.

112.    When Defendant Sanchez fired the fifth shot, Mr. Mooninghe was visibly unarmed, had raised his hands by his head, and was clearly incapacitated after being struck by four bullets.

**ORIGINAL COMPLAINT**

113.    Defendant Sanchez's conduct violated Mr. Moonesinghe's clearly established constitutional right to be free from excessive force without an immediate threat of serious or significant harm at each moment deadly force is used.

114.    The autopsy performed following Mr. Moonesinghe's death confirmed that Mr. Moonesinghe died because of blood loss caused by Defendant Sanchez's use of deadly excessive force.

115.    Defendant Sanchez further acted with evil motive or intent and/or reckless and callous indifference to Mr. Moonesinghe's Fourth Amendment rights, entitling Plaintiffs to punitive damages.

116.    Plaintiffs' requests for relief are set forth below.

### AS AND FOR A SECOND CAUSE OF ACTION FOR A VIOLATION OF
**42 U.S.C.A. § 1983, Civil Action For Deprivation of Rights
(Failure to Provide Medical Care and Treatment)
(As to Defendant Sanchez, Brito, and Markert)**

117.    Plaintiffs repeat and re-allege the allegations contained in the paragraphs above as if fully set forth herein.

118.    The conduct alleged herein deprived Plaintiffs, on behalf of Mr. Moonesinghe, of rights and privileges secured and protected by the United States Constitution and the laws of the United States, namely the Fourteenth Amendment protections against officers denying treatment for serious medical needs through deliberate indifference. The conduct violated Mr. Moonesinghe's clearly established constitutional rights and was not objectively reasonable under the circumstances.

119.    The Officer Defendants deliberately refused to treat Mr. Moonesinghe, ignored his serious medical complaints, delayed emergency medical treatment, and evinced a wanton

**ORIGINAL COMPLAINT**

disregard for Mr. Moonesinghe's serious medical needs that violated Mr. Moonesinghe's clearly established constitutional rights.

120.    A government official violates a pretrial detainee's Fourteenth Amendment right to medical care when the official acts with deliberate indifference to a detainee's serious medical needs.

121.    Officials act with deliberate indifference to serious medical needs when they (i) are aware of underlying facts indicating a substantial risk of serious harm or (ii) infer that there is a substantial risk of serious harm.

122.    Deliberate indifference to serious medical needs can be established by the refusal to treat a detainee, ignoring medical complaints, intentionally providing incorrect medical treatment, or any similar conduct that would clearly evince a wanton disregard for any medical needs.

123.    The Officer Defendants had actual knowledge that Mr. Moonesinghe was suffering substantial blood loss due to being shot five times. The Officer Defendants even acknowledged that Mr. Moonesinghe was having trouble and needed medical attention. Despite this actual knowledge, the Officer Defendants handcuffed Mr. Moonesinghe instead of providing immediate medical attention through CPR or attempting to stop the visible and profuse blood loss.

124.    The Officer Defendants also had actual knowledge of the need to release Mr. Moonesinghe from handcuffs so that he could receive immediate medical attention. However, the Officer Defendants refused and deliberately delayed medical treatment for Mr. Moonesinghe by leaving him in handcuffs for an additional critical two minutes.

125.    The Officer Defendants' denial of medical care and delay of emergency medical treatment deprived Mr. Moonesinghe of his basic human need for medical care. It allowed Mr.

**ORIGINAL COMPLAINT**

Moonesinghe to suffer extreme pain and extreme blood loss, thereby ultimately causing the death of Mr. Moonesinghe.

126.    The Officer Defendants further acted with evil motive or intent and/or reckless and callous indifference to Mr. Moonesinghe's Fourteenth Amendment rights, entitling Plaintiffs to punitive damages.

127.    Plaintiffs' requests for relief are set forth below.

### AS AND FOR A THIRD CAUSE OF ACTION FOR A VIOLATION OF
**42 U.S.C.A. § 1983, Civil Action For Deprivation of Rights
(Municipal Liability - Unconstitutional Official Policies)
(As to Defendant City of Austin)**

128.    Plaintiffs repeat and re-allege the allegations contained in the paragraphs above as if fully set forth herein.

129.    The conduct alleged herein deprived Plaintiffs, on behalf of Mr. Moonesinghe, of rights and privileges secured and protected by the United States Constitution and the laws of the United States, namely the Fourth Amendment right to be free from excessive use of force.

130.    The City Defendant's official policymaker in law enforcement created and promulgated the City Defendant's official deadly force applications policy, Section 200.5 of the APD General Orders.

131.    Section 200.5 of the APD General Orders authorizes and enables the City Defendant's officers to execute any person that the officer reasonably believes has committed an offense involving the infliction or threatened infliction of serious bodily injury or death when that person poses no immediate threat of serious or significant harm to an officer or any other person at the moment deadly force is used.

132.    It is well-settled law that it is unlawful for an officer to use deadly force without an immediate serious threat to himself or others at the exact moment deadly force is utilized.

**ORIGINAL COMPLAINT**

133.     Therefore, the City Defendant's written deadly force applications policy directs and authorizes its officers to engage in unconstitutional conduct through the excessive use of deadly force. A municipality is liable under § 1983 if a written policy directs or authorizes the deprivation of constitutional rights.

134.     The City Defendant's officers, including the Officer Defendants, are required and trained to follow the City Defendant's written deadly force applications policy in law enforcement operations.

135.     Defendant Sanchez thus acted according to the City Defendant's unconstitutional written policy when he acted with the goal of making an arrest after Defendant Sanchez heard Mr. Moonesinghe fire his weapon into his home, despite Mr. Moonesinghe posing no immediate threat of serious or significant harm when deadly force was utilized. The City Department's Interim Chief of Police, Robin Henderson, noted that Defendant Sanchez "responded to [Mr. Moonesinghe] consistent with his training."

136.     As a result, the City Defendant's written deadly force applications policy was a moving force behind the deprivation of Mr. Moonesinghe's constitutional rights and his eventual death.

137.     Plaintiffs' requests for relief are set forth below.

**AS AND FOR A FOURTH CAUSE OF ACTION FOR A VIOLATION OF**
**42 U.S.C.A. § 1983, Civil Action For Deprivation of Rights**
**(Municipal Liability – Custom or Practice)**
**(As to Defendant City of Austin)**

138.     Plaintiffs repeat and re-allege the allegations contained in the paragraphs above as if fully set forth herein.

**ORIGINAL COMPLAINT**

139.    The conduct alleged herein deprived Plaintiffs, on behalf of Mr. Moonesinghe, of rights and privileges secured and protected by the United States Constitution and the laws of the United States, namely the Fourth Amendment right to be free from excessive use of force.

140.    The City Defendant had a custom or practice of allowing APD officers to use excessive force against persons of color who posed no immediate threat of serious or significant harm.

141.    The City Defendant's official policymakers approved, ratified, and promulgated this custom or practice.

142.    An official policy can be established in the form of a widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy. *See Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 851 (5th Cir. 2009) (citing *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001)). In this context, "[a] customary policy consists of actions that have occurred for so long and with such frequency that the course of conduct demonstrates the governing body's knowledge and acceptance of the disputed conduct." *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 169 (5th Cir. 2010).

143.    Evidence of such a widespread practice or custom includes the following: (i) the highly specific, detailed accounts of fifteen incidents similar to Mr. Moonesinghe's experiences highlighted above involving the use of excessive force against persons of color who posed no immediate threat of serious or significant harm; (ii) the twenty-three lawsuits brought against the City Defendant from 2013-2022 involving the use of deadly force by APD officers where only three of the twenty-three lawsuits involved a white decedent; (iii) the use of deadly force against twelve unarmed persons who were not operating a motor vehicle from 2005 to 2017 where 83.3% of the victims were persons of color; (iv) APD records indicating that if APD officers used force

**ORIGINAL COMPLAINT**

at the rate they did against white people during every arrest each year, then 2,662 fewer people would have been subjected to APD's use of force from 2006 to 2016; (v) the March 2017 report from the City Defendant's Mayor's Task Force on Institutional Racism and Systemic Inequities that found systemic inequities in APD operations that result in racial disparities in law enforcement tactics and consequences for people of color; (vi) the Science of Policing Equity, Center for Policing Equity's study that found racial disparities in both use and severity of force by APD officers against persons of color that could not be explained by crime, poverty, education, age, or unemployment; and (vii) the then-Police Monitor Frasier notice to the City Defendant's leadership, including the mayor and police chief, that "the numbers themselves showed that the use of force against brown and black persons was disproportionate to those of whites."

144.    Such facts indicate a pattern of abuses that transcends the error made in a single case and indicates that incidents involving the use of excessive force against persons of color who posed no immediate threat of serious or significant harm are not limited to isolated instances.

145.    Such a widespread custom or practice occurred so frequently and publicly that the course of conduct warrants the attribution to the City Defendant's official policymakers of the knowledge that deprivations of the Fourth Amendment right to be free from excessive use of force for persons of color were an expected and accepted practice among Defendant CMC's employees.

146.    The widespread custom or practice allowed by the City Defendant significantly increased the likelihood that APD officers would continue to use excessive force against persons of color who posed no threat of serious and immediate harm and, therefore, led Defendant Sanchez to act accordingly when he killed Mr. Moonesinghe, a person of color, posing no immediate threat.

**ORIGINAL COMPLAINT**

147.    As a result, the City Defendant's custom or practice of allowing APD officers to use excessive force against persons of color who posed no immediate threat of serious or significant harm was the moving force behind Mr. Moonesinghe's wrongful death.

148.    Plaintiffs' requests for relief are set forth below.

### AS AND FOR A FIFTH CAUSE OF ACTION FOR A VIOLATION OF
**42 U.S.C.A. § 1983, Civil Action For Deprivation of Rights**
**(Wrongful Death)**
**(As to all Defendants)**

149.    Plaintiffs repeat and re-allege the allegations contained in the paragraphs above as if fully set forth herein.

150.    Defendants' previously established violations of Mr. Moonesinghe's constitutional rights led to Mr. Moonesinghe's death due to Defendant Sanchez's use of deadly excessive force and the Officer Defendants' failure to provide necessary medical treatment.

151.    Defendants' constitutional violations more likely than not led to Mr. Moonesinghe's death.

152.    Plaintiffs' requests for relief are set forth below.

### DEMAND FOR JURY TRIAL

153.    Plaintiffs demand a jury trial on all matters raised in this Complaint.

### PRAYER FOR RELIEF

Plaintiffs respectfully request judgment against Defendants as follows:

A.    Declaring that the practices complained of herein are unlawful and in violation of the rights of Mr. Moonesinghe under the U.S. Const. and 42 U.S.C. § 1983;

B.    Awarding all damages which Plaintiffs have sustained as a result of Defendants' conduct, including for physical injuries, medical bills, emotional distress, and anguish;

C.    Pre-judgment and post-judgment interest, as provided by law;

**ORIGINAL COMPLAINT**

D. Awarding Plaintiffs punitive damages in an amount commensurate with Defendants' ability and so as to deter future malicious, oppressive, and/or unlawful conduct;

E. Granting Plaintiffs reasonable and necessary attorneys' fees and expenses which Plaintiffs have incurred and will continue to incur during all trial and appellate court proceedings pursuant to 42 U.S.C. § 1988;

F. Awarding Plaintiff Johann Moonesinghe, as the representative of the Estate of Mr. Moonesinghe, damages for conscious pain and mental anguish prior to Mr. Moonesinghe's Death, funeral and burial expenses, and exemplary damages;

G. Awarding Plaintiff Ruth Moonesinghe and Kavan Moonesinghe, as wrongful death beneficiaries of Mr. Moonesinghe, damages for mental anguish, loss of companionship and society, and pecuniary loss;

H. That the Court retain jurisdiction over Defendants until such time as it is satisfied that they have remedied the practices complained of and are determined to be in full compliance with the law; and

I. Awarding Plaintiffs such other and further legal and equitable relief as may be found appropriate and as the Court may deem just or equitable.

Plaintiffs also seek injunctive relief, including, but not limited to:

A. Adoption of policies, standards, and training that limit the risk of death during arrests of persons of color;

B. Adoption of use-of-force policies and standards that limit the use of force to being a last resort when there is no reasonable alternative and only when necessary to prevent imminent and serious bodily injury or death;

**ORIGINAL COMPLAINT**

C.  Supervisory discipline up to and including immediate termination for any employee or agent of the City Defendant who engages in excessive use of force;

D.  Supervisory discipline up to and including termination for the Officer Defendants and any employee or agent of the City Defendant involved in the incidents described herein;

E.  Monitoring by the Court or a federal agency to ensure that Defendants comply with all injunctive relief.

Plaintiffs further demand that they be awarded such other and further legal and equitable relief as may be found appropriate or as the Court may deem just or equitable.

Dated: November 12, 2024                    Respectfully submitted,

*/s/ David W. Henderson*
David W. Henderson
Texas State Bar No. 24032292
dhenderson@equalrights.law
**Ellwanger Henderson LLLP**
400 S Zang Blvd, Suite 600
Dallas, Texas 75208
Telephone: (214) 948-3334
Facsimile:  (214) 853-9410

Jay D. Ellwanger
Texas State Bar No. 24036522
jellwanger@equalrights.law
Brian Pounds
Texas State Bar No. 24126432
bpounds@equalrights.law
**Ellwanger Henderson LLLP**
11149 Research Blvd., Suite 100
Austin, Texas 78759
Telephone: (737) 808-2260
Facsimile:  (737) 808-2262

**COUNSEL FOR PLAINTIFFS**

**ORIGINAL COMPLAINT**